Good morning, Your Honors. I'm William Cohan, and I represent Rothwell, Ltd. Do you want to try to save any time? I'd like to reserve five minutes. Five minutes. Okay. I'll try to remind you. Okay. This is a case about control. And the controlling case that we feel controls the decision here is the Stern case. The Stern case supports the proposition that there should be de novo review. Now, what did you say? I said the Stern case supports the proposition that there should be de novo review. De novo review. Okay. But even if this Court's review were for clear error, there is clear error here. And the error is clear because all this case concerned was control. Control allegedly by Joseph Francis as opposed to what the government admitted in the pretrial order, and that was that Rothwell's officers controlled the Rothwell account that was levied on. That's the issue here today. What about nominee ownership? I'll ask you the same question I asked counsel in the last case. Are you disagreeing that California recognizes nominee ownership? Certainly not. California absolutely recognizes nominee ownership. And I must apologize for a lot of briefing on the various laws that we studied. I went to the Turks and Caicos Islands. We took depositions of lawyers. We learned so much we just had to tell you all about it. And I apologize because regardless of what law you employ, the result is the same. There's simply no evidence to sustain the district court's conclusion in paragraph 32 that, and that's you asked about the excerpt of the record. I believe it's on page 8 in volume 1. And there the district court decided that Francis controlled. But that decision is not only contrary to the government's admission. And, again, your position is that we are on that factual determination to, in effect, ignore the district court and conduct a de novo review of the facts ourself? Is that what you're saying? No. I think you could and you should conduct an independent and de novo review. Now, we're talking about facts here. But even if you do that. How do we do that? We're a court of appeal. We look at papers. We don't hear people except the counsel. We don't see their demeanor. We can't judge anything about how we perceive their truthfulness. I'm a little puzzled. You're suggesting that, in effect, we just ignore the findings of the district court. No. We just look at what the evidence is. Okay. So you're saying whether or not there's substantial evidence to back up the court's finding. Is that what you're saying then? I missed the first part. Are you saying then that we're going to ignore the district court? We're supposed to look and see whether there are, in the record, there is substantial evidence to back up the district court's finding. Is that correct? There certainly should be some evidence. Oh, I understand that. But I'm asking for the standard of review that you are suggesting we must follow here. I'm suggesting that I believe that the Ninth Circuit's Stern case makes this a mixed question of law Great. But for purposes of this case, how does that translate to what we need to do, in fact, as far as the findings that the district court made? What standard of review do we apply to the district court's determination? As you say, the district court's findings are devastating to your client because it shows control all along and feeds into the nominee concepts and so on. If those go out the window, then, you know, you're in good shape, at least as far as where we are right now. But we have to have some basis for reviewing what the district court did. What is that? What's the standard of review? As I said, I believe it's de novo. De novo on facts? De novo in looking at the evidence on which the district court purportedly relied. And that evidence, I want particularly to invite this Court's attention to the admitted facts by the government. Those admitted facts were in the pretrial order that the district judge refused to sign, just as the district court refused to consider the motion for summary judgment. And both of those were premised on the fact that there were no facts in dispute. Because as the government admitted it. Let me ask you a question, Counsel. What was the ultimate source of the money in Rothwell's Morgan Stanley brokerage account? The origin of the funds came from Mantra Films and SANS Media. That was the origin. Those funds were transferred totaling approximately $15 million. But $7 million was made as income. And that income was made by securities trades. Literally hundreds of securities trades. And those securities trades that Rothwell made were made without any knowledge or participation by Mr. Francis or anyone over whom Mr. Francis had any influence. Who owned the two entities to which you made reference that made the transfer to Rothwell? Oh, Mr. Francis owned all the stock in those two entities. Okay, so legally he controls it then? He certainly controlled the sources of the funds that went into that account. Okay. And I think that's what my colleague was asking. Okay. I'm sorry if I didn't address that directly. Mr. Francis clearly did control both of the sources. He was the ultimate source of the money then. He was the ultimate source of 15 of the $22 million. The other $7 million, as I said, was profit generated by trades that were made. Most of those trades were made by a broker at Morgan Stanley Smith Barney named John Welker. John Welker was deposed, and his evidence, his notes in particular, in the record, pages 3174 to 3177, identify 85 phone calls that he had with Rothwell's directors. And as the government conceded, Rothwell's officers controlled, directed, and managed the operations, finances, assets, and investment decisions of Rothwell Limited. Okay, well, let's say that's true. If Mr. Francis owned all the stock of the entities that owned those shares or those stocks or whatever, and he either gave direction to or gave plenty of potential authority to someone else to invest them, isn't he still – aren't those actions imputed to him? I think Your Honor is conflating. I'm sorry? Is he not like the puppeteer pulling the strings? Not only is he not like the puppeteer, there are no such strings. There are no such puppets. Well, tell me this. What major payments, if any, were made from the Morgan Stanley account other than the ones that went toward purchasing the Mexican properties? Well, millions and millions of dollars were made to purchase securities. They were bought and sold. They were bought and sold hundreds of times. Now, if you're talking about transferring assets, what Rothwell did through its officers was to essentially declare a dividend to the trustee. The trustee was Hallmark. Hallmark then took that roughly million dollars and invested it in two other corporations, all the shares of which it owned. And then those funds went to purchase the Mexican real estate. So the answer to my question is there were no other major purchases. That's true. You made your point about the fact that money was invested in stocks and the income stayed there. That's a separate issue. Okay. I just wanted to make sure we were on the same page. I understand Your Honor saying a separate issue, but with respect, I don't believe that it is a separate or separable issue because the issue is control of Rothwell. It is true that Mr. France's corporations were the sources of funds that went into the Rothwell account originally. But as I say, Hallmark and its officers controlled all of what happened with those funds. But with respect, Mr. Cohen, you seem like a really smart guy. Do you think, whether you think we're smart or not, do you really think that anybody can believe that when Mr. Francis owned and controlled these entities, presumably picked the people who did the trading, had the lawyer who controlled it overall, that he had no control over it? I mean, we'd have to be absolute schtumps to believe that, wouldn't we? I'm hard-pressed to figure out what it is that you think you'd be hard-pressed to believe. Your question assumes some things that simply aren't true and for which there's no evidence. I am responding to what I think you are saying, which is basically we've got these separate entities here, and even though Mr. Francis owns all of them, he had nothing to do with what happened with the money or the investments or what it was used for. I'm just saying that defies reason, doesn't it? No, not at all. In fact, the only reason why Mr. Francis did what he did to divest himself of control is because he anticipated that because of the nature of his business, that these young ladies whom he was videotaping and got permission from, when they found out how much money he was making selling those videos, they would sue him. I thought this was done after he lost a tax case. My goodness, Your Honor. This trust was set up in 1999. The tax issue didn't arise until, well, when he was charged initially was 2007. That was eight years later. Okay. The transfer took place in 2000 and 2003. The trades were done from 2002 through 2007. The person who was the broker had left the brokerage. The person who was the trustee was replaced by a new trustee, as to whom Mr. Francis had no connection whatsoever. That's why the government admitted what it admitted. Can you clarify these facts for me, please? Yes, sir. Am I correct that Francis never paid rent for staying on the property owned by Casablanca? Is that correct? That's absolutely correct, yes. He paid over $6 million to build it. Just answer yes or no, or we're never going to get through this, please. And he built a luxury home, which he used as his personal residence on that property, correct? Yes, he did. What other use did that property have? I didn't find any other use in the record. That's all it was used for, but it was an investment which enriched the trust. The $100,000 deposit for the Mexico property was returned to him, right? Yes, it was. Did Francis expect to be repaid once the trust funded the full payment? What full payment? The full payment for the property. Not only did he not expect it, it never happened. Instead, the trust itself, through its ownership of the shares of the two corporations that own the Mexican corporation, the trust increased its wealth almost $6 million by virtue of the fact that Mr. Francis' corporations spent that money to increase the value of the trust's assets. So it went to the trust, not from the trust. Mr. Francis is still living in the house in Puerto Vallarta. Yes, he is. I mean, at least part of the time, although we're... And has he paid any rent at any time for the property he occupies? In addition to all the expenses of maintenance, upkeep, insurance, taxes, no. No additional rent. Do you want to save any time for a rebuttal? We're well down into this. Yes, I certainly would. Okay, very good. I'd like to clarify what I think are some serious factual misimpressions by the court. Okay. Thank you. Let's hear from the government. May it please the court, my name is Ivan Dale on behalf of the United States. I'm happy to work the court through whatever factual questions it has. I mean, at the end of the day, this is an investment account that was funded by a delinquent taxpayer, that was managed by the delinquent taxpayer's broker, that was set up by the delinquent taxpayer's attorney, that was titled to a third party, the appellant, expressly to defeat the claims of creditors of the delinquent taxpayer. Let me ask you this, counsel. Despite opposing counsel's questions about whether we had read any of this, I'd like to know your view as to whether, well, let me restate it. The district court made findings about all of these things in making this determination. What is the standard of review that we have in this case for reviewing the district court's factual findings? It's a clear error. Clear error. As with any factual finding. Okay. So it's not de novo review in a factual situation. I've never heard de novo review of factual findings except in maybe the administrative law context or something like that. Okay. Is there evidence that, I'm sorry, were you done? No, I am. Thank you. Is there evidence that Mr. Francis himself made payments directly to Rothwell or was any payment made through one of the Francis S. corporations? What was the evidence on that front? All of the money that was in the Rothwell account came from, came originally from Francis' two entities, Sands and Mantra, which he owned and controlled completely. And then, so are we supposed to do like a veil piercing in a case like this or? Well, I mean, it's pretty clear that, you know, Francis was diverting his corporate funds to the Rothwell account. You know, I mean, he had the right to draw from those S. corporations, you know, whatever dividends or funds he liked at any time. And rather than just cutting himself a check and then cutting a check to Rothwell, he set up an account and the account at Sands was entitled Casablanca and set up a series of $250,000 wire transfers every so often that would go to a Bermuda Bank account. At that Bermuda Bank account that was opened by the appellant, the appellant informed the Bermuda Bank account that it was being held as nominee for Francis. It was an account that Rothwell was the nominee and it was being held for the benefit of Joe Francis. And then there was a standing agreement with respect to that Bermuda account that whatever came into that Bermuda account immediately was transferred into the Morgan Stanley account that was levied upon. And the government's position is that, in fact, the nominee theory applies here because all of these people were just a subterfuge and all the entities were a subterfuge for him to evade tax payments. Yeah, I mean, I think it's a fairly egregious shell of a game that was played in this case. Mr. Cohen says a reason Mr. Francis set up and perhaps needed to set up these corporations was to protect Mr. Francis from lawsuits from the girls and the girls gone wild, I guess, videos. What do we do with that? Does that somehow justify this? No, I think that makes our case. I mean, he did it to avoid paying potential creditors. That is an affront to the law of the state of California to permit a man to self-settle a trust in order to evade the claims of creditors. And let's be clear. The money that the very tax claim that we were seeking to collect was because Mr. Francis improperly deducted the payments that went into the Rothwell account as phony insurance expenses and as phony consulting expenses. So as he was settling the Rothwell account, he was avoiding the taxes that we now seek to collect from the Rothwell account. So it's pretty explicit that the purpose of this particular arrangement was not only to defeat the claims of creditors such as the young women who have posed in girls gone wild videos, but also to defeat the claims of creditors such as the IRS. Putting the best light on his argument, he might say that he was purchasing the Mexican property. That was an objectively reasonable trust investment and that allowing him to build on that property only increased the value. And that's all fine and good. Well, the two transfers that came from the Rothwell account, the Morgan Stanley account, that went to purchase an adjacent lot, that lot 13B, and was purchased in 2005. And the purpose of purchasing that adjacent lot was to improve the view of Mr. Francis from his luxury beachfront residence. Rothwell was not the title holder of the luxury beachfront residence or of lot 13B. It wasn't even in the chain of title. It was simply for the benefit of Francis, and I suppose for the benefit of Francis' trust, if you want to think of it that way. But the fact of the matter is, it was all done at the bidding of Francis. All roads lead to Francis. Yes. He suggested it. His attorney was also the attorney for the entity and had power of attorney to act on behalf of the entity that purchased the Mexican property. There was some suggestion in the record that he was having some disagreements with his counsel over control of the trust fund. Yes. That might well support the inference that he didn't control them. I think it actually supports the contrary inference. I mean, the issue is what rights he had in 2000, what rights Francis had in 2009 at the time of the levy. All of this wresting of control from Francis occurred in 2011, two years later, while this litigation was pending. And at trial, Mr. Raymond, the attorney who was seeking to wrest control back from Francis of the matters, testified that he was doing so because if he didn't, it would look like Francis controlled the entity. So it seems to me like the reason why they were doing this was because it would be further bad evidence in their case. And that Francis's reaction to that, because he was quite angry to that, was that his understanding of the arrangement was that prior to that time that he actually did pull the strings. And he considered it contrary to their understanding that he couldn't do whatever he wanted with the Rothwell assets. What Mr. Francis said with respect to his attorney's statements and who really controlled the property. Did I understand you correctly? Well, there were two things. There was an e-mail exchange, and it's actually contained in the plaintiff's brief between. OK, so what I'm looking for in response to Judge Zahari's questions, I thought you indicated that there was a trial. I think you said that Mr. Francis's attorney testified that he. The reason that they were having this dispute was to make it clear that he, the attorney, was in control because it didn't look good if Mr. Francis was in control. Is that correct? Well, the attorney didn't say Mr. Francis. Oh, I understand. He said the reason why I'm not going to step down as protector of this trust and the reason why we're doing this this way is because if we didn't, it would look like. It would look like. And where is that on the record? It's in the testimony of Brian Raymond, and let's see. It is on excerpts of record page 391. OK, and where is the e-mail or whatever it was from Mr. Francis to Mr. Raymond indicating his unhappiness with what he said? These are the 2001 e-mails. Those are located. They're, again, cited in, I believe, the brief, the reply brief at length, if I'm not mistaken. Why don't you cite the reply brief then? Just give me the quote, the citation. Again. I hate searching for this. Oh, here. Well, the e-mails themselves, I don't have the record cite for, but they are in the excerpts of record. I'm sure. Or in the brief? Where in the brief or the reply brief? In the plaintiff's opening brief, they discuss the exchange, the testimony in which the e-mails are described, and that is on page 35 through 36 of the opening brief of the appellate. OK, that's fine. So, you know, I think the district court did a thorough analysis of the factual underpinnings of this case. Tell me where the six-factor test applies to this case. How does it apply to this case? Well, the six factors. I know what they are. Is it important in this case? Well, I mean, under the nominee theory, it is. I mean, we also did proceed under an alternate theory, which is there's no such thing as a self-settled discretionary trust. I mean, there is such a thing, but under the law of California or really any American jurisdiction. Do we not need to get to the nominee theory? You can avoid the nominee theory by going to the issue of the self-settled discretionary trust. But the district court's decision was premised on the nominee theory. Do you agree with that decision? Absolutely. And I think the court analyzed the factors well. It didn't list all six. But again, nominee is a very fact-intensive, facts and circumstances kind of inquiry. Those factors are not intended to be all-inclusive. What about the trust document? It suggested a different choice of law other than California. The trust, the document that settled the Francis Trust, there was a choice of law provision that said that Turks and Caicos law would apply to the interpretation of provisions of that trust document. And? Should we not follow the trust document? Well, again, California courts don't enforce choice of law provisions if they would offend the public policy of the state. You find that provision offensive, I take it. Well, I do. I think it's to think that I could take my bank account and put it in the name of a nominee, an offshore nominee, and just because that offshore jurisdiction says that even if it's held as nominee, no creditor can reach it. I mean, that's, you know, the federal revenue can't operate. The government can't collect federal revenue if that's all you have to do to circumvent collection. It is that choice of law issue where the appellate indicates that the Hague Trust Convention controls, and that's why you've got to give credit to that. But that convention was never ratified by the United States. Is that correct? That's correct. So it does not control in this situation. It is not binding on the courts of the state of California or on the federal courts. And I will say this, I don't even know that even under Turks and Caicos law there was really a nominee analysis done or whether or not they – I mean, Turks and Caicos law, they may be a tax haven, but at least they won't recognize a trust that is a complete sham. So if there's the settlor and the protector and the beneficiary of the trust, they won't even recognize that because you're just pulling all the strings. And really, at the end of the day, Rothwell's argument depends on adhering to formalities when I think that it's clear that the form adopted by the parties was but a legal fiction to attempt to avoid the payment of debts by Mr. Francis. And we think that the district court correctly analyzed the nominee factors in this regard, and we ask this Court to affirm that judgment. Okay. Thank you for your argument. We'll hear rebuttal from Mr. Cohan. Let me save you one bit of trouble. I was thinking of another case we're hearing today when I made the statement I did about the tax court. So strike that from your mind. You needn't worry about it. I was thinking of a different case. Yes, Your Honor.  Oh, it's not an insult. I want to tell this Court that finding that Brian Rayment and Colin Schaaf committed perjury, which is implicit in the district court's findings is totally wrong. I understand. And I will not defend Mr. Francis in any way, shape or form. His conduct was extremely outrageous, and his tax evasion is equally offensive. But when he divested himself of control of these assets, he divested himself of control, and he had every good reason to do that. And the people who controlled those assets were not his nominees. The evidence unequivocally establishes that. The government admitted it at trial, and that's why the district court didn't like that result and decided not to sign the pretrial order. Now, this Court can obviously resolve this case. It's going to resolve this case. We are. But, well, I mean, there's theoretically these things called petitions for certiorari, but we know they're rarely granted. Go for it. We like those. Your Honor. The Ninth Circuit loves petitions for certiorari. Your Honor. I am trying to point out what the evidence did really show. I understand that because Joe Francis did these things, they're presumably fraudulent. And the people who assisted him in doing what I contend was what the evidence shows are so tainted by the fact that the money originally came from Joe Francis that what they did and what the evidence shows is simply going to be disregarded. Counsel, your argument about the judge and the conclusions, almost you want us to disregard all of what he found given what was presented to him. Was this judge drinking Red Bull and watching girls go crazy instead of paying attention to the record? I don't understand. I don't, other than just the result-oriented analysis, because Joe Francis shouldn't get away with defeating the claims of the United States. Even if the trustees were independent, as they were, even if Rothwell was independent, which it was, even if Joe Francis had no control and the only influence he ever exerted was to say, gee, it would save me a million dollars on this $6 million I'm spending on this house in Mexico, if the trust would put that million dollars into the real estate, and then I'll transfer ownership to the trust and enrich the trust to the tune of another $6 million. We appreciate your argument, Mr. Cohan. I think we're done. Thank you very much. Thank you, Your Honor. The case of Rothwell v. United States is submitted.
judges: Zouhary, Smith, Murguia